IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LARRY HILL, | ) |
| Plaintiff, | ) |
| vs. | ) Civil Action No. 08-900 |
| EDUCATION MANAGEMENT CORP., | ) |
| Defendant. | ) |

AMBROSE, District Judge

# OPINION AND
# ORDER OF THE COURT

## SYNOPSIS

Plaintiff, an African-American male, whose employment was terminated, asserts race and gender discrimination claims as well as a claim for retaliation. Defendant Employer contends that what Plaintiff perceives to be unlawful discrimination was nothing more than perceived favoritism. Plaintiff's race and gender claims cannot survive the scrutiny of summary judgment, but the retaliation claim will go forward.

## OPINION

Plaintiff Larry Hill ("Hill") worked in a variety of capacities over the years for Defendant Education Management Corporation d/b/a the Art Institute of Pittsburgh ("the Art Institute"). Immediately prior to his termination he held the position of Associate Director of Admissions. His direct supervisor, Jeffrey Bucklew, the Director of Admissions, had promoted him from his

prior position as Assistant Director of Admissions in July of 2006. As an Associate Director, Hill gained managerial and training responsibilities and was still required to meet his personal goals of recruiting new students to attend the Art Institute.

The Art Institute measured recruitment performance by assessing such things as the number of telephone calls to prospective students, the number of appointments set, the number of interviews held, the number of applications submitted by prospective students and the number of students recruited who started classes. Unsolicited inquiries from prospective students were received either by mail, phone or the Internet. These "leads" were then distributed among members of the Admissions Department.

Hill's race, gender and retaliation claims have their genesis in the distribution of these "leads." Specifically, Hill contends that Bucklew unequally distributed these leads. According to Hill, Bucklew gave the best and the most leads to a select group of Caucasian women. He contends that he, and other African-Americans and men, were denied the same number and quality of leads. Bucklew's unfair method of distributing the leads caused, Hill insists, a backlash in the Admissions Department. Many of the individuals not the beneficiaries of Bucklew's largess began complaining of his actions. The Art Institute conducted an investigation and ultimately, on April 9, 2007, terminated both Hill's and Gloria Hunt's (a Caucasian woman)[1] employment based upon the belief that they had disrupted the office over the issue of unfair lead distribution, that they had acted with insubordination and that Hill had intimidated a colleague. The Art Institute added that, though performance alone would not have mandated Hill's termination, his poor performance was a factor in his termination.

---

[1] Hunt was Hill's peer at the Art Institute.

Hill then commenced this action. He asserts claims of race discrimination under 42 U.S.C. § 1981 ("§ 1981"); under Title VII of the Civil Rights Act, 42 U.S.C. § 200e-2 ("Title VII"); under the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA") and under Chapter 659.02 of the Pittsburgh City Code.  He also asserts claims of sex discrimination in violation of Title VII, the PHRA and the Pittsburgh City Code and claims of retaliation under § 1981, § 2000e-3(a) of Title VII, the PHRA and under the Pittsburgh City Code.  His race and gender claims are two-fold: that the distribution of leads was based upon race and sex, and that his termination was based upon his race and sex.  The Art Institute challenges Hill's ability to establish a *prima facie* case of race and gender discrimination as well as his ability to establish that its articulated non-discriminatory reason for its actions was mere pretext for discrimination. The Art Institute challenges the viability of the retaliation claim as well.  See Docket No. [19].

## Standard of Review

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is material when it might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Rule 56 mandates the entry of judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, the Court must examine the facts in the

light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. Anderson, 477 U.S. at 248.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex, 477 U.S. at 322.  Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

## Analysis

**I. Race Discrimination**

As stated above, Hill asserts a race discrimination claim under Title VII, § 1981, the PHRA and the Pittsburgh City Code.  While the statutory language differs to some degree,[2] the claims are all predicated upon unlawful discrimination based upon race.  The familiar burden

---

[2] Title VII declares it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 200e-2(a).  Section 1981 provides that "[a]ll persons in the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ... ."  Section 659.02(a) of the Pittsburgh City Code provides, in relevant part, that it is "an unlawful employment practice ... (a) for any employer to refuse to hire any person or otherwise to discriminate against any person with respect to hiring, tenure, compensation, promotion, discharge or any other terms, conditions or privileges directly or indirectly related to employment because of race... ."

shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to Hill's race discrimination claims, given his lack of direct evidence of discrimination.[3]  Under the McDonnell Douglas test, Hill bears the initial burden of establishing a *prima facie* case of unlawful discrimination. McDonnell Douglas, 411 U.S. at 802.  If Hill succeeds, the burden of production shifts to the Art Institute to articulate a legitimate, nondiscriminatory reason for its actions. Id.  This burden is "relatively light."  If this burden is met, the burden of production then shifts back to Hill who must "show by a preponderance of evidence that the employer's proffered reason is pretextual." Whitmire, 2009 WL 2028348 at * 2, *citing*, Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  That is, Hill generally must submit evidence which:

> (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendants so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

Whitmire, 2009 WL 2028348 at * 2, *citing*, Fuentes, 32 F.3d at 762.  "Because the ultimate issue is whether 'discriminatory animus' motivated the employer, it is not enough to show that the employer made a 'wrong or mistaken' decision." Whitmire, 2009 WL 2028348 at * 2, *citing*, Fuentes, 32 F.3d at 765.  "Rather, the plaintiff must uncover 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation that would allow a reasonable factfinder to believe that the employer did not truly act for the asserted reason." Id.

I will accept, for purposes of the pending Motion only, that Hill has established a *prima facie* case of race discrimination (both as to the unfair distribution of leads and to his

---

[3] This test is used for Title VII, section 1983, and the PHRA. See Whitmire v. Kvaerner-Philadelphia Shipyard, Civ. No. 7-3259, 2009 WL 2028348 at * 2 n. 1 (3d Cir. July 14, 2009). Hill does not dispute that the analysis applies to his Pittsburgh City Code claims as well.

5

termination) under the relevant statutes.  Having reviewed the evidence, I find that the Art Institute has met its "relatively light" burden of articulating a legitimate, nondiscriminatory reason for its actions.  With respect to the distribution of leads, the Art Institute explained that the system of distribution depended upon attendance, seniority and, most often, performance.  See Hill Dep., at 183-84; Pry Dep., at 10-12, Hallett Dep., at 23-25, 40-41; Hughes Dep., at 13-16 and Pasa Dep, at 6-16.  As the start of a new semester approached and the Art Institute most needed new students, more leads were distributed to those employees producing the best results.  See Hill Dep., at 183-84; Bucklew Dep., at 42-46; Pry dep., at 10-12; Hallett Dep., at 23-25 and 40-41; Hughes Dep., at 7-16; and Pasa Dep., at 6-16.

With respect to the termination, the Art Institute explained that it conducted an investigation of Bucklew and his alleged inappropriate distribution of leads and relationships with certain employees and concluded that Hill and Gloria Hunt, a Caucasian woman, had engaged in subordination with respect to Bucklew, intimidated a subordinate and disrupted the office setting.  See Hallett Dep., at 5-8 and 32-33; Pry Dep., at 11-13 and 17-18; Bucklew Dep., at 27-29 and Bucklew Affidavit, ¶ 26-28.  Indeed, Sandra Leindecker, one of Hill's colleagues, reported that Hill's discussions with her regarding Bucklew made her feel "uncomfortable."  See Leindecker Dep., p. 22-23.  Similarly, Stephanie DiVito, one of Hill's direct subordinates, told Hallett that she received an intimidating call at home from Hill threatening that if she declined to speak out against Bucklew, Hill would make her life "extremely difficult."  See DiVito Affidavit, ¶ 3-11 and April 2007 Meeting Notes at 1.

The Art Institute's evidence regarding the distribution of leads and Hill's termination, taken as true, permits the conclusion that there were nondiscriminatory reasons for the

unfavorable employment decisions. See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Consequently, the burden of production shifts back to Hill who must show, by a preponderance of the evidence, that the Art Institute's proffered reasons for its actions are pretextual. In other words, Hill must submit evidence which casts sufficient doubt upon each of the legitimate reasons proffered by the Art Institute so that a factfinder could reasonably conclude that each reason was a fabrication or allows the factfinder to infer that the discrimination was more likely than not a motivating or determinative cause for the adverse employment action. See Whitmire, 2009 WL 2028348 at * n. 2, *citing*, Fuentes, 32 F.3d at 762. The ultimate issue is whether "discriminatory animus" motivated the employer. Whitmire, 2009 WL 2028348 at * 2, *citing*, Fuentes, 32 F.3d at 765.

     Hill has not discharged his burden. Significantly, his brief is silent on the issue of pretext. He fails entirely to address the issue either as to the distribution of leads or the termination of his employment. Indeed, the "legal analysis" portion of his Response to Defendant's Motion for Summary Judgment (Docket No. [29]) avers that "Hill can make out a *prima facie* case of race discrimination," (p. 27), but provides no legal analysis or application of law to fact, relating to pretext. I decline to comb through Hill's 135 paragraphs of asserted Statement of Material Facts and determine which he intends to relate to the issue of pretext. Hill is not acting *pro se.* He is represented by counsel. It is not the Court's duty to provide legal analysis for a party.

     Any such argument on Hill's behalf would be moot. Turning to the evidence discussed

by Hill in the "*prima facie*" portion of his brief, a thorough and fair[4] analysis of Exhibits 18 and 19 proffered by Hill refutes any claim of discrimination and buttresses the Art Institute's position that the distribution of leads was not based upon race.  Exhibit 18 (which represents leads distributed over an 8 month period) lists 40 employees.  Six of those employees are African American, 34 are not.  Of those 34, only six received more leads than Hill.  The remaining twenty-eight non-African-American employees received fewer leads than did Hill.  Indeed, as demonstrated by Exhibit F to the Art Institute's Reply Appendix, African-American employees on average received more leads than did non-African-Americans during the eight month period at issue.

Exhibit 19 (which represents leads distributed over a 19 month period) represents just a portion of the conversion reports for the relevant period.  A full report for the applicable period is set forth in Exhibit E to the Reply Appendix.  Exhibit E reveals that, of 60 employees, 6 are African-American and 54 are not.  Further analysis shows that only 10 non-African-Americans received more applications than did Hill, while 44 non-African-Americans received less.  In light of these statistics, one can hardly infer pretext.

As to Hill's termination, the only other employee that the Art Institute's investigation revealed had fomented unrest among colleagues other than Hill was Gloria Hunt.  She, a

---

[4] Hill's statistical analysis submitted in support of his *prima facie* argument includes in his sample leads assigned to Chad Scott.  Mr. Scott is an African American who was employed by the Art Institute for less than two months.  Nevertheless, Hill included his data in the sample representing leads assigned during an eight month period.  Because Mr. Scott's figures unfairly skew the sampling, I decline to include them in my analysis.

Caucasian, was terminated on the same day as Hill and for the same reasons.[5] Again, it is difficult to infer that the Art Institute's articulated, nondiscriminatory reason for terminating Hill was merely pretext for discrimination when another individual outside of the protected class was treated in a manner identical to Hill. Further, Hill's efforts to compare himself to others who complained about Bucklew but who were not fired fall flat. First, contrary to his assertions, Hill was not fired because he complained to his superiors about Bucklew. He was fired for disrupting the Admissions Department, for intimidating a subordinate, for insubordination and for poor performance. See Hallett Dep., p. 5-8 and 32-33; Pry Dep., at 11-13 and 16-18. Second, as an Associate Director of Admissions, Hill had management responsibilities; those to whom he compares himself did not. See Hallett Dep., at 5-8 and 32-33; Hill Dep., at 49-53. As such, they are not fair comparators. Third, Hill failed to proffer any evidence that any decision maker at the Art Institute was aware that anyone other than Hill or Hunt had been disrupting the office with complaints about Bucklew.

Simply stated, Hill has not proffered any evidence or argument suggesting that the Art Institute's explanations are pretextual.[6] Consequently, the Art Institute is entitled to the entry of summary judgment in its favor on Hill's claims of race discrimination under Title VII, § 1981, the PHRA and the Pittsburgh City Code.

---

[5] Hunt's "belief" that she was fired in order to neutralize any claim for race discrimination does not constitute evidence either of discrimination or pretext.

[6] Hill's vague references in his "prima facie" analysis to the "proximity in time" between his complaints about the disparity in leads and his termination of employment does not demonstrate pretext with respect to his discrimination claim. While "proximity in time" between a plaintiff's protected conduct and an adverse employment action may be relevant to a claim for retaliation, Hill has not identified any case law indicating that it is relevant to demonstrating pretext in a claim for race discrimination.

**2. Gender Discrimination**

As stated above, Hill also asserts claims of gender discrimination under Title VII, the PHRA and the Pittsburgh City Code. As were the race claims, the gender claims are predicated upon lead distribution and Hill's termination. These claims, which have substantially the same elements, are also analyzed in accordance with the McDonnell Douglas test set forth above. See Ganaway v. City of Pittsburgh, Civ. No. 5-1657, 2008 WL 336297 at * 4 (W.D. Pa. Feb. 4, 2008). Again, I will accept, for purposes of the pending Motion only, that Hill has established a *prima facie* case of gender discrimination under the relevant statutes. The burden then shifts to the Art Institute to offer a legitimate, non-discriminatory reason for its actions. The Art Institute offers the same reasons that it did with respect to Hill's claims of race discrimination - that the leads were disbursed according to a variety of factors such as attendance, seniority and performance and that Hill was terminated because of insubordination, intimidating a co-worker, disrupting the office and poor performance. See Docket No. [21], p. 13 n. 3. Consequently, the burden shifts back to Hill, who must show by a preponderance of evidence that the Art Institute's proffered reasons are pretextual.

For essentially the same reasons set forth above with respect to his race discrimination claims, Hill has failed to discharge this burden. He offers absolutely no legal analysis of pretext in terms of the gender discrimination claims. Further, a review of the evidence defeats any contention of pretext. Hill proffers Exhibits 18 and 19 as evidence of the discriminatory distribution of leads. Exhibit D to the Reply Brief offers a summary of Exhibit 18. Taken together, the Exhibits reveal that, of the 40 ADAs, 33 are female and 7 are male. The Exhibits further indicate that Hill received more leads than 27 of the female employees. With respect to

the 16 month period covered by Exhibit 19, only 11 of the 50 females received more leads than did Hill.  As to Hill's termination, it is unrefuted that a female employee was terminated on the same day and for the same conduct as was Hill.  One can hardly infer that the Art Institute was motivated by "discriminatory animus" toward male employees in the distribution of leads and the termination of Hill when women in similar circumstances as Hill suffered the same fate as did Hill.  Thus, in light of Hill's failure to demonstrate pretext, summary judgment is granted in favor of the Art Institute and against Hill on his claims of gender discrimination.

### 3. Retaliation

Hill asserts claims of retaliation under § 1981, Title VII, the PHRA and the Pittsburgh City Code.  The same McDonnell Douglas framework set forth above governs these claims as well. See Green v. Winter, Civ. No. 8-140, 2009 WL 3150349 at * 17 (E.D. Pa. Sept. 24, 2009) (applying the analysis to a retaliation claim asserted under Title VII); Solomon v. Philadelphia Newspapers, Inc., Civ. No. 5-5326, 2008 WL 2221856 at * 12 (E.D. Pa. May 21, 2008) (applying the analysis to a claim asserted under § 1981); Crosby v. UPMC, Civ. No. 7-501, 2009 WL 735868 at * 16 (W.D. Pa. March 20, 2009) (applying the analysis to a claim asserted under the PHRA) and Ganaway, 2008 WL 336297 (applying the analysis to a claim asserted under the Pittsburgh City Code).  Thus,  Hill bears the initial burden of establishing a *prima facie* claim.  Though the legal analysis under each statute differs  to some degree, each requires, as part of its *prima facie* case, that the plaintiff demonstrate that he or she engaged in "protected activity."  See Crosby, 2009 WL 735868 at * 16 (PHRA); Solomon, 2008 WL 2221856 at * 16 (§ 1981); Green, 2009 WL 3150349 at * 17 (Title VII).  The Art Institute challenges Hill's ability to demonstrate

that he engaged in protected activity.[7]

Specifically, the Art Institute contends that the only alleged "protected activity" occurred on March 27, 2007 when Hill had a meeting with Pry and Hallett. The Art Institute insists that the message Hill conveyed at this meeting would not have alerted an objective listener to the fact that Hill was opposing an unlawful employment practice. See Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (stating that ("[w]hether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an *objectively reasonable belief*, in good faith, that the activity they oppose is unlawful under Title VII," and "the employee's 'opposition' to unlawful discrimination *must not be equivocal*") (emphasis added). After careful review, however, I find that sufficient evidence exists based upon which a reasonable jury could find that Hill had an objectively reasonable belief that he opposed unlawful activity and that his opposition was not equivocal. At the March 27th meeting, Hill contends that he complained of favoritism, which he explained as "there were admissions representatives, female, white, in the office getting tons more than me, as well as any other black admissions representative in the office. That was my biggest concern as far as that. So you've got favoritism as far as who is getting what ... ." See Hill Dep., p. 21-22. Hill identified those individuals, white and female, who he believed were getting the preferential treatment. Id.   Again, in his Answers to Interrogatories, Hill states that in the March 27th meeting with Pry and Hallett, he complained

---

[7] The Art Institute raises, as a separate challenge to the viability of the retaliation claim, Hill's ability to demonstrate pretext. However this basis was not set forth in the original Motion or Brief as is required. Rather, it was set forth, for the first time, in a Reply Brief. Further, I agree with Hill that sufficient evidence exists of temporal proximity between the voicing of complaints of discrimination, the subsequent investigation and his termination of employment, to sustain a finding of pretext.

of "outright discrimination" and identified the white, female workers to whom Jeff Bucklew gave the best leads. See Docket No. [22], Ex. I.  Perhaps Hill failed to use the magic words of "racial discrimination" or "gender discrimination."  Yet he identified what he thought to be favoritism, explained that those benefitting from the favoritism were the white and female employees and at the expense of the black and male employees.  Reasonable jurors could view Hill's complaints as explicitly or implicitly alleging that race and gender were the reasons for the alleged unfairness.  Accordingly, I find the cases cited by the Art Institute to be unpersuasive.  The Motion for Summary Judgment is denied in this regard.

**ORDER OF COURT**

AND NOW, this 13th day of October, 2009, after careful consideration, and for the reasons set forth in the accompanying Opinion, the Motion for Summary Judgment (Docket No. [19]) is granted in part and denied in part.  It is granted insofar as summary judgment is entered against the Plaintiff and in favor of the Defendant with respect to the claims of race and gender discrimination.  It is denied with respect to the claim for retaliation.

It is further Ordered that a Status Conference is scheduled for November 2, 2009 at 12:00 p.m.

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose,
U.S. District Judge